IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

NEW MANCHESTER RESORT &
GOLF, LLC,

    Plaintiff,

      v.

DOUGLASVILLE DEVELOPMENT,
LLC, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:09-CV-504-TWT

## ORDER

This is a Clean Water Act case.  It is before the Court on the Plaintiff's Motion for Partial Summary Judgment [Doc. 108], the Defendants' Motion for Summary Judgment [Doc. 126], and the Defendants' Motion to Exclude Expert Testimony and Report of John Vermont [Doc. 136].  For the reasons set forth below, the Plaintiff's Motion for Partial Summary Judgment is DENIED, the Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, and the Defendants' Motion to Exclude Expert Testimony and Report of John Vermont Exclude is DENIED.

## I.  Background

The Plaintiff New Manchester Resort & Golf, LLC owns 309 acres of land in Douglas County, Georgia.  The owners had intended to build a golf course, resort, and conference center on their property.  But they have not built those things yet, and their property remains minimally developed.  The Plaintiff purchased its property from New Manchester LLC in 2003.  The Defendants Douglasville Development, LLC and Sweetwater Investment Properties, LLC own 1,442 acres of land adjacent  to the property of the Plaintiff.  They have developed, and continue to develop, substantial parts of their property.  They have built subdivisions, parks, and retail space as part of a new mixed-use development called the Tributary at New Manchester.  The Defendants also purchased their property from New Manchester LLC in 2003.

An unnamed tributary (the "Stream") of Sweetwater Creek originates on the Defendants' property and flows into the Plaintiff's.  After it enters Plaintiff's property, the Stream flows into a series of wetlands and then into Sweetwater Creek.  Sweetwater Creek in turn flows into the nearby Chattahoochee River.  The Plaintiff says that the Defendants have discharged "sediment-laden storm water" from their property into the Stream.  (Compl. ¶ 13.)  Although the Defendants have a permit to discharge storm water, the Plaintiff says that the Defendants violated the permit's conditions by failing to maintain best management practices, violating Georgia's in-

stream water quality standards, and ignoring monitoring and reporting requirements. The Plaintiff also says that the Defendants placed fill material into the Stream and the wetlands. The Defendants do not have a permit to place fill material.

The Plaintiff asked the Defendants to stop the discharges and fix the damage to the Plaintiff's property, but the parties were unable to resolve their dispute. On October 23, 2008, the Plaintiff sent the Defendants an intent to sue letter. (Id., Ex. A.) On February 25, 2009, the Plaintiff filed this Clean Water Act case against the Defendants. The Plaintiff asserts Clean Water Act claims for violating the conditions of the storm water discharge permit (i.e., failing to maintain best management practices, violating Georgia's in-stream water quality standards, and ignoring monitoring and reporting requirements) and for placing fill material without a permit. See 33 U.S.C. § 1311. The Plaintiff also asserts state law claims for nuisance, trespass, and negligence. The Plaintiff seeks relief in the form of a permanent injunction, civil penalties, compensatory and punitive damages, and attorney fees.

The parties have filed a number of motions that are ready for decision by the Court. The Defendants move for summary judgment as to all of the Plaintiff's claims. They say that (1) the Plaintiff lacks constitutional standing to assert its claims, (2) the Plaintiff's intent to sue letter failed to provide notice of all of its claims, (3) there is insufficient evidence that the Defendants violated their permit conditions, (4) an

administrative fine by a local government agency precludes the Plaintiff's Clean Water Act claims, (5) a drainage easement and restrictive covenant precludes the Plaintiff's state law claims, and (6) there is insufficient evidence of damages.  They also move to exclude the expert testimony of John Vermont.  The Plaintiff moves for summary judgment as well, but only as to the Defendants' liability under the Clean Water Act for violation of permit conditions.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

### A.    Standing

To satisfy the constitutional requirement of standing, a plaintiff must show injury in fact, traceability, and redressability.  The plaintiff must show that:

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).  The plaintiff bears the burden of showing standing, and it must do so with respect to each claim.  Id.  The purpose of the standing inquiry is to ensure "that a plaintiff has a sufficient personal stake in a dispute to render judicial resolution appropriate."  Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 153 (4th Cir. 2000).  The Court will address each element separately.

1.   Injury in Fact

The Plaintiff says that there has been concrete and actual damage to its property.  Its evidence includes testimony from Richard Whiteside, the Plaintiff's biology expert.  Whiteside conducted a bathymetric survey of the Plaintiff's property in October 2008.  (Expert Report of Richard W. Whiteside.)  He found that the property had "received recent sediment deposition of approximately 2,834.5 cubic yards."  (Id., at 4.)  This "rate of sedimentation [is] greater than the wetland can assimilate" and may undermine the health of the wetlands on the Plaintiff's property:

Q. All right. And what's the practical effect of getting sediment in there that is more than can be assimilated?
A. Well, you've get [sic] a lot of things that can happen. Number one, you got poor water quality. You get increased turbidity, sedimentation, which can then in turn smother aquatic inspects [sic], other aquatic forms, aquatic eggs, fish eggs, salamander eggs and so forth, that basically you reduce and damage the food chain.

(Whiteside Dep. at 86-87.) Whiteside also looked at the cost of cleaning up the accumulated sediment. He found that the cost of removing the sediment and restoring the wetlands "is estimated to be approximately $980,000." (Expert Report of Richard W. Whiteside, at 5.) Whiteside's testimony about sediment accumulation, the health of the wetlands, and clean up cost is sufficient evidence of injury in fact to the Plaintiff's property.

The Defendants "acknowledge that customarily the existence of [sediment accumulation] and a removal cost would establish standing." (Defs.' Reply Br. in Supp. of Their Mot. for Summ. J., at 14.) They say, however, that this case is different because the Plaintiff is a corporation. They say that, as a corporation, the Plaintiff must also show that:

(1) its members would otherwise have standing to sue in their own right;
(2) the interests at stake are germane to the organizations' purpose; and
(3) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit.

(Br. in Supp. of Defs.' Mot. for Summ. J., at 24.) But that standard only applies to representational or associational standing. That is not what the Plaintiff is asserting.

It is asserting standing based on an injury to itself.  Cf. Warth v. Seldin, 422 U.S. 490, 511 (1975) ("There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.").  The Plaintiff owns the property that is directly affected by the Defendants' discharges, and it says that its property – not someone else's – has been damaged.  The Plaintiff, therefore, does not need to make any showing regarding its members' standing or the corporation's purpose.

The Defendants also say that a corporation cannot have recreational, aesthetic, or environmental interests.  See Citizens Coordinating Comm. on Friendship Heights, Inc. v. Washington Metro. Area Transit Auth., 765 F.2d 1169, 1173 (D.C. Cir. 1985) ("Though a corporation is a person for some purposes, we would be most reluctant to hold that it has senses and so can be affronted by deteriorations in its environment.").  Even assuming that is correct, corporations surely have property and economic interests, and the Plaintiff has shown an injury to those interests.  See 13A Charles Alan Wright et al., Federal Practice and Procedure, § 3531.8 (3d ed. 2008) ("Injuries under the Clean Water Act can be tangible property interests; they need not be aesthetic or recreational interests.").  Whiteside found that the property had "received recent sediment deposition of approximately 2,834.5 cubic yards." (Expert Report of Richard W. Whiteside, at 4.)  An accumulation of sediment on the Plaintiff's property

"can be demarcated as a traditional trespass on property." Gaston Cooper Recycling, 204 F.3d at 154.  Whiteside also found that the cost of removing the sediment and restoring the wetlands on the property "is estimated to be approximately $980,000." (Expert Report of Richard W. Whiteside, at 5.)  The cost of restoring its property is an injury to the Plaintiff's economic interests.

Lastly, the Defendants say that the Plaintiff cannot show an injury in fact for the Defendants' alleged failure to comply with the monitoring and reporting requirements of their permit.  They say that lack of information is not a concrete and particularized injury.  But the courts have held otherwise.  Cf. Northwest Envtl. Advocates v. City of Portland, 56 F.3d 979, 988 (9th Cir. 1995) ("[The] permit conditions that courts commonly enforce [under the Clean Water Act] are not effluent limitations, but rather, requirements for retaining records of discharge sampling and for filing reports.").  For example, in Sierra Club v. Simkins Industries, Inc., 847 F.2d 1109 (4th Cir. 1988), the court explained that the loss of information caused by monitoring and reporting violations undermined efforts by the plaintiffs to "remedy the effects of any pollution" and to prevent "any ongoing unlawful discharges." Id. at 1113.

There is evidence of the same type of injury in this case.  "[The Plaintiff] seeks not only to protect the environmental integrity of the [Stream] and wetlands on its

property, but it also seeks to curtail the ongoing discharge of pollutants into these waterways from the construction activity on [the Defendants'] adjacent land." (Orr Second Aff. ¶ 10.) "[H]owever, because [the Defendants] failed to create accurate records . . ., [we] are unable to rely on their records to know the full extent of the pollution caused by their construction activities." (Id. ¶ 9.)

The cases cited by the Defendants are distinguishable because they did not involve any concrete environmental injury to the plaintiff. They involved monitoring and reporting violations, but no particularized environmental injury. See Public Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 124 (3d Cir. 1997) ("Implicit in [most cases] is the assumption that the defendant's effluent discharges posed a real threat to the environment. Such injury or threat of injury is not present in this case, as [the defendant] has conclusively proven that its discharges posed no threat to the Wickecheoke Creek or [the plaintiff's members]."); Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp., No. 6:94-CV-489, 1995 WL 17133045, at *8 (E.D. Tex. Sept. 22, 1995) ("[The plaintiff] fails to cite a single case stating that lack of monitoring, reporting, and recordkeeping information alone provides standing under the CWA.") (emphasis added).

Although the Plaintiff has presented sufficient evidence of injury in fact to its property, its evidence does not relate to all of its claims. Whiteside testified about the

Defendants' alleged discharge of sediment-laden storm water, and for that claim, his testimony is enough.  But he has not said anything about whether the Defendants' alleged placement of fill material has affected the Plaintiff's economic or property interests.  He has only said that the Defendants placed riprap material and rock check dams into the stream on their property and that they did so without a permit. (Whiteside Dep. at 269-271.)  The Plaintiff, therefore, has not shown an injury in fact for its claim that the Defendants placed fill material without a permit.

> 2.   Traceability

To show traceability in a Clean Water Act case, "[r]ather than pinpointing the origins of the particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." Gaston Copper Recycling, 204 F.3d at 161; see also Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 72 (3d Cir. 1990).  The Plaintiff says that the Defendants have discharged sediment-laden storm water into the Stream.  Its evidence includes testimony from Whiteside (the Plaintiff's biology expert), Steven Rowe (the Plaintiff's erosion control expert), and Joey Vaughn (an employee of the Douglasville-Douglas County Water and Sewer Authority).  Whiteside found that, "based on field observations, aerial photographs and defined drainage basins that the source of the[]

recently deposited sediments in the stream and wetlands is from the ongoing upstream Tributary [at New Manchester] development."   (Expert Report of Richard W. Whiteside, at 4.)  Rowe testified in his deposition that the failure of the Defendants' erosion control measures caused sediment to escape from the Defendants' property and deposit downstream onto the Plaintiff's property.  (Rowe Dep. at 104-07.) Vaughn made the same observation as Rowe, even agreeing that "there [was no] question in [his] mind that [sediment] went into the stream." (Vaughan Dep. at 35.) The testimony from Whiteside, Rowe, and Vaughn is sufficient evidence of traceability.

The Defendants say that there are other sources of sediment accumulation. These other sources include natural flooding and erosion, a gas pipeline that runs through the wetlands, the presence of wild pigs, logging roads on the Plaintiff's property, and the Plaintiff's alleged use of all-terrain vehicles. (Br. in Supp. of Defs.' Mot. for Summ. J., at 13-14, 33-34.)  But the Plaintiff has presented evidence that these other sources  are either insignificant or did not cause the recent accumulation of sediment on the Plaintiff's property. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 25-27.)

In any event, the Plaintiff doesn't need to rule out other sources of sediment accumulation.  "To establish standing to redress an environmental injury, plaintiffs

need not show that a particular defendant is the only cause of their injury, and that, therefore, absent the defendant's activities, the plaintiffs would enjoy undisturbed use of a resource." Natural Res. Def. Council, Inc. v. Watkins, 954 F.2d 974, 980 (4th Cir. 1992). "The 'fairly traceable' requirement . . . is not equivalent to a requirement of tort causation." Powell Duffryn Terminals, 913 F.2d at 72. If it were, "plaintiffs would be required to supply costly, strict proof of causation to meet a threshold jurisdictional requirement - even where, as here, the asserted cause of action does not itself require such proof." Gaston Copper Recycling, 204 F.3d at 161. To show traceability, the Plaintiff only needs to show that the Defendants are a source – not the only source – of sediment accumulation. It has made that showing.

   3. Redressability

  To redress the concrete and actual damage to its property, the Plaintiff asks for a permanent injunction, civil penalties, compensatory and punitive damages, and attorney fees. "[I]t is likely, as opposed to merely speculative," that the Plaintiff's injuries will be addressed by a favorable decision granting the Plaintiff's requested relief. Laidlaw Envtl. Servs., 528 U.S. at 181. In particular, the Plaintiff's requested injunctive relief would require that the "Defendants restore the biological and ecological integrity of the streams, tributaries and wetlands affected by the discharges

[of sediment-laden storm water]."  (Compl. ¶ 94.)  The Defendants do not dispute that the Plaintiff has satisfied the redressability element of standing.

The Plaintiff has shown injury in fact, traceability, and redressability for its claims related to the discharge of storm water.  It has not, however shown an injury in fact for its claims related to alleged placement of fill material.  The Court, therefore, has jurisdiction to address the Plaintiff's claims related to the Defendants' discharge of storm water.

B.   Notice

The Clean Water Act requires that a citizen plaintiff give notice of claims before filing a complaint.  "No action may be commenced . . . prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator [of the Environmental Protection Agency], (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation or order . . . ."  33 U.S.C. § 1365(b).  The EPA has provided further detail about the contents of such notice:

> Notices . . . shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order which has allegedly been violated, the activity alleged to be in violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name and address of the person giving the notice.

40 C.F.R. § 54.3.  The notice requirement is "strictly construed to give the alleged violator the opportunity to correct the problem before a lawsuit is filed."  National Parks & Conservation Ass'n Inc. v. Tennessee Valley Auth., 502 F.3d 1316, 1329 (11th Cir. 2007).

The Plaintiff alleges that the Defendants violated their permit conditions by ignoring monitoring and reporting requirements.  The Plaintiff, however, failed to provide proper notice of this claim in its intent to sue letter.  (Compl., Ex. A.) Although that letter mentions that the Defendants failed to maintain best management practices, violated Georgia's in-stream water quality standards, and placed fill material without a permit, the letter does not say anything about monitoring and reporting requirements.  Nothing in the letter tells the Defendants that the Plaintiff is alleging that they ignored monitoring and reporting requirements.  In fact, the first time that the Plaintiff even addressed these requirements was in its Motion for Partial Summary Judgment.  That is too late to provide sufficient notice under the Clean Water Act.

The Plaintiff says that it provided notice that the Defendants were violating other permit conditions and that, by investigating those allegations, the Defendants should have realized that they had also ignored monitoring and reporting requirements.  Although there may be some appeal to this argument, it is not consistent with the rule that the notice requirement must be "strictly construed to give

the alleged violator the opportunity to correct the problem before a lawsuit is filed."

National Parks & Conservation Ass'n, 502 F.3d at 1329.  As the Eleventh Circuit

explains:

> The language of the [notice requirement] does not suggest that the notice
> may be good enough if it generally orients the agency or violator as to
> the type of violation.  The recipient of the notice must understand from
> the notice what the citizen is alleging – not what the citizen could allege
> if the citizen knew more or cared about other possible transgressions.

Id. at 1330 (quoting California Sportfishing Prot. Alliance v. City of W. Sacramento,

905 F. Supp. 792, 799 (E.D. Cal. 1995)[1]).  Therefore, even if the Defendants should

have realized they had ignored monitoring and reporting requirements, that is not

sufficient to show notice.  The Plaintiff needed to include those allegations in its intent

to sue letter.

Because the Plaintiff failed to provide notice that the Defendants were ignoring

monitoring and reporting requirements, the Defendants are entitled to summary

judgment as to that claim.  The Plaintiff, however, has provided sufficient notice of

its other Clean Water Act claims, and so the Defendants are not entitled to summary

judgment as to those claims.

---

[1]The court in California Sportfishing Protection Alliance also stated that "[i]t
will not suffice to give notice of a monitoring violation by giving notice of an effluent
violation.  The two violations are distinct and plaintiff must give notice of each."
California Sportfishing Protection Alliance, 905 F. Supp. at 799.

C.    Violation of Permit Conditions

The Clean Water Act prohibits discharge of pollutants, except in compliance with a permit.  To establish a Clean Water Act violation, a plaintiff must show that there has been a discharge of a pollutant into waters of the United States from a point source without or in violation of a National Pollutant Discharge Elimination System permit.  Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1008 (11th Cir. 2004).

The substantive issue in dispute is whether the Defendants violated the conditions of their NPDES permit – General Permit No. GAR100003.  (Defs.' Mot. for Summ. J., Ex. 125.)  This permit was issued by the State of Georgia.  The Clean Water Act "allows states to implement their own permit programs after receiving EPA authorization, 33 U.S.C. § 1342(b), and Georgia has done so."  Parker, 386 F.3d at 1005.  The permit is an "authorization to discharge under the NPDES storm water discharges associated with construction activity for stand alone construction projects." (Defs.' Mot. for Summ. J., Ex. 125.)  Even though the conditions of the permit are established by the State of Georgia, they are enforceable in citizen suits under the Clean Water Act.  Parker, 386 F.3d at 1005.

The Plaintiff says that the Defendants violated the permit's conditions by failing to maintain best management practices, violating Georgia's in-stream water quality standards, and ignoring monitoring and reporting requirements.  As discussed above,

the Plaintiff failed to provide notice that the Defendants were ignoring monitoring and reporting requirements.  That leaves whether the Defendants failed to maintain best management practices and whether they violated Georgia's in-stream water quality standards.

The permit provides that "[f]ailure to properly design, install, or maintain best management practices shall constitute a violation of this permit for each day on which such failure occurs."  (Defs.' Mot. for Summ. J., Ex. 125, Part III.C.2.)  Best management practices "means schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent and minimize erosion and resultant sedimentation, which are consistent with, and no less stringent than, those practices contained in the 'Manual for Erosion and Sediment Control in Georgia' . . . ."  (Id., Ex. 125, Part I.B.1.)

The Plaintiff has presented sufficient evidence that the Defendants failed to maintain best management practices.  Steve Rowe, the Plaintiff's erosion control expert, testified in his deposition that the Defendants built a temporary sediment detention pond that was not "reviewed and permitted."  (Rowe Dep. at 99-100.)  Rowe said that this pond was undersized and improperly maintained and that, on more than one occasion, he saw evidence that the detention pond had failed and silt had escaped.  (Rowe Dep. at 85-86, 162, 226.)  Richard Whiteside, the Plaintiff's biology expert,

testified in his deposition that he also saw evidence that the detention pond had failed and silt had escaped.  (Whiteside Dep. at 195.)  There is also evidence from the Douglasville-Douglas County Water and Sewer Authority.  On August 28, 2008, the Douglasville-Douglas County WSA fined the Defendants $500 for "discharge of stormwater runoff from disturbed area where best management practices have not been properly designed, installed, or maintained."  (Vaughan Dep., Ex. 1.)  It also issued an official stop work order on the same day, prohibiting any further work until the Defendants fixed the problems.  (Id., Exs. 2-3.)  Even the Defendants' own inspection reports indicate that there were often deficiencies with their erosion control practices.  (Kelly Dep. at 28-29, 43); (Id., Ex. 1.)

The permit also incorporates Georgia's in-stream water quality standards.  "No discharges authorized by this permit shall cause violations of Georgia's in-stream water quality standards as provided by the Rules and Regulations for Water Quality Control, Chapter 391-3-6-.03."  (Defs.' Mot. for Summ. J., Ex. 125, Part I.C.4.)  Among other things, those standards require that "[a]ll waters shall be free from turbidity which results in substantial visual contrast in a water body due to a man-made activity."  Ga. Comp. R. & Regs. 391-3-6-.03(5)(d).  However, "for land disturbing activities, proper design, installation, and maintenance of best management

practices and compliance with issued permits shall constitute compliance with Paragraph 391-3-6-.03(5)(d)." Id.

The Plaintiff has presented sufficient evidence that the Defendants violated Georgia's in-stream water quality standards. Mike Jackson, who helps manage the Plaintiff's property, has on multiple occasions through 2008 and 2010 seen discolored water running into the Stream and the wetlands on the Plaintiff's property. (Jackson Aff. ¶¶ 7-13); (Jackson Second Aff. ¶ 7.) He has taken photographs, which have been submitted as exhibits to his affidavit, that depict "the bright reddish-orange silt and sediment that had been recently deposited into the stream" and the "significantly stained and discolored water that [he] observed." (Jackson Aff. ¶ 7.) Whiteside has also seen discolored water and taken photographs that "depict sediment laden, turbid water in the wetlands." (Whiteside Aff. ¶ 5.) Rowe testified in his deposition that this change in color is the result of construction activities:

> Q.  Okay.  Can you just describe in your professional opinion the condition of that water from the turbidity standpoint?
> A.  It's obviously got suspended clays based upon the orange color, which is indicative of construction activities.
> Q.  And why is it indicative of construction activities?
> A.  If it were top soil transportation it would be more of a dark color versus the orange.  It has a significant color change when the soil type changes.

(Rowe Dep. at 248.)

In response, the Defendants say that the only way to violate the permit's conditions is to cause a turbidity increase of more than twenty-five nephelometric turbidity units (NTUs).   They say that the Plaintiff never took any NTU measurements, and so the Plaintiff cannot establish a violation.   But the Defendants have misread the permit.   The permit provides that a turbidity increase of more than twenty-five NTUs is <u>additional</u> proof of a violation, not that it is the <u>only</u> proof of a violation.   This is clear from the language of the permit:

> 3.   A discharge of storm water runoff from disturbed areas where best management practices have not been properly designed, installed, and maintained <u>shall constitute a separate violation</u> for each day on which such discharge results in the turbidity of receiving water(s) being increased by more than ten (10) nephelometric turbidity units for waters classified as trout streams or more than twenty-five (25) nephelometric turbidity units for waters supporting warm water fisheries, regardless of a permittee's certification under Part II.B.1.i.

(Defs.' Mot. for Summ. J., Ex. 125, Part III.C.) (emphasis added).   Even without NTU measurements, the Plaintiff may still prove a violation by showing that the Defendants failed to maintain best management practices.   "Failure to properly design, install, or maintain best management practices <u>shall constitute a violation of this permit for each day</u> on which such failure occurs."   (<u>Id.</u>, Ex. 125, Part III.C.2.) (emphasis added).   The Plaintiff may also still prove a violation by showing that the Defendants caused a violation of Georgia's in-stream water quality standards.   "No discharges authorized by this permit shall cause violations of Georgia's in-stream water quality standards as

provided by the Rules and Regulations for Water Quality Control, Chapter 391-3-6-.03." (Id., Ex. 125, Part I.C.4.)

The Defendants also say that subjective water quality standards are not enforceable in a citizen suit. The distinction seems to be that conditions like "do not discharge more than X amount of a pollutant" are objective and enforceable, while conditions like "do not interfere with natural water quality" are subjective and unenforceable. To support their argument, the Defendants rely almost exclusively on Satterfield v. J.M. Huber Corp., 888 F. Supp. 1561 (N.D. Ga. 1994), in which Judge O'Kelley held that "citizens cannot sue for alleged violations of a non-objective standard . . . , even where such a standard is incorporated into a permit." Id. at 1566. But that holding was based on a Ninth Circuit opinion, Northwest Environmental Advocates v. City of Portland, 11 F.3d 900 (9th Cir. 1993), which was later vacated. In its substituted opinion, the Ninth Circuit rejected the argument that citizens "may enforce only those conditions that have been translated into numeric effluent limitations." Northwest Envtl. Advocates v. City of Portland, 56 F.3d 979, 988 (9th Cir. 1995). "Because the statutory language, legislative history, and case law authorize citizens to enforce permit conditions stated in terms of water quality standards, we hold that [the plaintiff can] enforce the water quality standards contained in [the defendant's] NPDES permit." Id. at 990.

In light of the Ninth Circuit's new opinion, the holding in <u>Satterfield</u> is not persuasive.  In fact, in a case decided after the new <u>Northwest Environmental Advocates</u> opinion, Judge O'Kelley stated that "[t]he CWA authorizes citizen suits for the enforcement of <u>all</u> conditions of NPDES permits." <u>Culbertson v. Coats Am., Inc.</u>, 913 F. Supp. 1572, 1581 (N.D. Ga. 1995) (emphasis added) (<u>citing</u> <u>Northwest Envtl. Advocates</u>, 56 F.3d at 986).  He then granted summary judgment to the plaintiffs as to their claims involving state water quality standards:

> Plaintiffs have produced evidence that the discharge from the [defendant's facility] discolors Eastanollee Creek so as to interfere with legitimate aesthetic uses of the water. Defendant has not produced viable evidence to the contrary.  Accordingly, plaintiffs are entitled to summary judgment as to their CWA claim for violation of the Georgia Rules proscription of discharge with produces discoloration.

<u>Id.</u> at 1581-82.

The holding in <u>Satterfield</u> is also inconsistent with the Eleventh Circuit's reasoning in <u>Parker</u>.  In <u>Parker</u>, the defendants argued that "the permit was obtained pursuant to state law, and [federal courts] do not have jurisdiction over a violation of state law." <u>Parker</u>, 386 F.3d at 1005.  The Eleventh Circuit rejected this argument, concluding that the "plain language of the CWA and the relevant case law . . . convince us that there is federal jurisdiction over citizen-suit claims that allege violations of a state-issued NPDES permit." <u>Id.</u>  It explained that:

> The CWA citizen-suit provision allows "any citizen" to sue "any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1). . . . The relevant question, then, is whether EPA-approved state permit conditions qualify as "an effluent standard or limitation under this chapter." Again, the text of the statute is revealing. "Effluent standard or limitation under this chapter" is defined to include "a permit or condition thereof issued under section 1342 of this title." 33 U.S.C. § 1365(f)(6). Section 1342(b), in turn, authorizes states to administer their own permit programs, and thereby issue state permits, after receiving EPA approval. Thus, a plain reading of this statute indicates that state permits and conditions fall within the effluent standards or conditions covered "under this chapter."

Id. at 1005-06.  Although Parker did not involve state water quality standards, the textual analysis does not suggest that some conditions of a state permit should be enforceable while others are not.  Moreover, in discussing the relevant case law, the Eleventh Circuit cited favorably to Northwest Environmental Advocates and Culbertson, both of which – as discussed above – do involve state water quality standards. Id. at 1008.

Because the Plaintiff has presented evidence that the Defendants failed to maintain best management practices and violated Georgia's in-stream water quality standards, the Defendants are not entitled to summary judgment as to these claims. The Plaintiff, though, does more than just oppose the Defendants' motion.  It also requests summary judgment in its favor.  The Plaintiff says that the Defendants have not presented any evidence to rebut its eyewitness testimony and accompanying photographs of a substantial visual contrast in the water running through the Stream

and the wetlands.  But the Defendants have presented some evidence of an issue of fact.  They have presented evidence that the natural conditions of the soil and water in the area produce the orange to red color that the Plaintiff's witnesses saw.  (Br. in Supp. of Defs.' Mot. for Summ. J., at 33-34.)  This evidence would mean that the Defendants did not violate Georgia's water quality standards because a violation only occurs if the substantial visual contrast is due to human activity.  "All waters shall be free from turbidity which results in substantial visual contrast in a water body due to a man-made activity."  Ga. Comp. R. & Regs. 391-3-6-.03(5)(d) (emphasis added).

The Plaintiff also concedes that whether the Defendants maintained best management practices is a disputed issue of fact.  (Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 23-24.)  A trier of fact could thus conclude that the Defendants maintained best management practices.  This conclusion would mean that the Defendants did not violate Georgia's water quality standards because proof of best management practices is essentially an affirmative defense.  "[F]or land disturbing activities, proper design, installation, and maintenance of best management practices and compliance with issued permits shall constitute compliance with Paragraph 391-3-6-.03(5)(d)."  Id.  Therefore, the Plaintiff is not entitled to summary judgment that the Defendants failed to maintain best management practices or violated Georgia's in-stream water quality standards.

D.    <u>Administrative Remedies</u>

The Clean Water Act contains provisions that preclude certain citizen suits when a state government has already filed a similar action or taken administrative action to address the alleged violations.  <u>See</u> <u>Culbertson</u>, 913 F. Supp. at 1579.  The Defendants say that these provisions should apply to this case because, in August 2008, the Douglasville-Douglas County WSA fined the Defendants $500 and issued a stop work order.  In making this argument, the Defendants do not cite to any specific part of the Clean Water Act, even though there are at least three different sections that might apply.  The Defendants also do not discuss any of the various elements required by these statutory provisions.  Instead, the Defendants simply copy a few general principles from <u>Culbertson</u> and then assert that the Clean Water Act precludes the Plaintiff's claims.

There are three different sections of the Clean Water Act that could apply to this case: first,

> [A]ny violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . shall not be the subject of a civil penalty action under . . . section 505 of this Act[, which is the section on citizen suits.]

33 U.S.C. § 1319(g)(6)(A)(ii); second,

> [A]ny violation . . . for which . . . the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case

> may be, shall not be the subject of a civil penalty action under . . . section 505 of this Act[, which is the section on citizen suits.]

33 U.S.C. § 1319(g)(6)(A)(iii); and third,

> [n]o action may be commenced . . . under subsection (a)(1) of this section[, which is the section on citizen suits,] . . . if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order . . . .

33 U.S.C. § 1365(b)(1)(B).

None of these sections apply to this case because each requires action by a "State."  The Clean Water Act defines "State" as "a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Trust Territory of the Pacific Islands."  33 U.S.C. § 1362(3).  The Clean Water Act next defines "municipality" as a "city, town, borough, county, parish, district, association, or other public body created by or pursuant to State law and having jurisdiction over disposal of sewage, industrial wastes, or other wastes . . . ."  33 U.S.C. § 1362(3).  Based on these definitions, the Douglasville-Douglas County WSA is not a State.  See Illinois Public Interest Research Group v. PMC, Inc., 835 F. Supp. 1070, 1074 (N.D. Ill. 1993) ("Several decisions in fact conclude that action by a local governmental body is not action by a 'State,' within the meaning of [the Clean Water Act].").  Because it is not

a State, actions by the Douglasville-Douglas County WSA cannot preclude the Plaintiff's claims.

Even if the Douglasville-Douglas County WSA were considered a State, these sections still would not apply to this case.  Two of the sections require that "a State has commenced and is diligently prosecuting" an action against the Defendants.  33 U.S.C. §§ 1319(g)(6)(A)(ii), 1365(b)(1)(B).  The phrase "diligently prosecuting" implies a currently pending action.  But there is no currently pending action against the Defendants.  The Defendants paid their fine and made repairs to their development site in late 2008.  There is no evidence that the Douglasville-Douglas County WSA is still – two years later – pursuing any administrative action against the Defendants. The remaining section requires that "the violator has paid a penalty assessed under . . . comparable State law . . . ." 33 U.S.C. § 1319(g)(6)(A)(iii).  But the administrative fine issued by the Douglasville-Douglas County WSA does not identify any State law as the basis for its fine.  (Vaughan Dep., Pl.'s Ex. 1.)  Nor do the Defendants cite any State law that could provide a basis for the fine.  Even if it had been issued pursuant to some State law, there is still the question of whether that State law is "comparable" to the Clean Water Act.  Therefore, the Defendants are not entitled to summary judgment based on the fine issued by the Douglasville-Douglas County WSA.

E.     Drainage Easement and Restrictive Covenant

When the Defendants purchased their property from New Manchester LLC in 2003, the parties entered into a "Drainage Easement and Restrictive Covenant." Among other things, it provides that:

> New Manchester hereby grants to Sweetwater for the benefit of the Sweetwater Property, and to Douglasville Development for the benefit of the Douglasville Development Property the irrevocable, non-exclusive right, privilege and easement over, across and through that portion of the New Manchester Property described on Exhibit "B" attached hereto and incorporated herein by reference (the "Easement Parcel") to discharge surface water runoff from the Sweetwater Property and the Douglasville Development Property into Sweetwater Creek.

(Defs.' Mot. for Summ. J., Ex. 22, at 1.)  The Defendants concede that this easement does not affect potential liability for Clean Water Act violations.  (Defs.' Reply Br. in Supp. of Their Mot. For Summ. J., at 8) ("[N]o private agreement may violate the CWA (a point, incidentally, fully conceded by Defendants at the outset) . . . ."). Instead, they say that the easement establishes consent that defeats the Plaintiff's state law claims for nuisance, trespass, and negligence.  See DeSarno v. Jam Golf Mgmt., LLC, 295 Ga. App. 70, 72 (2008).

Although the Defendants have the right to discharge runoff, this right is not unlimited and does not authorize discharges that would undermine the natural state of the unnamed tributary and wetlands.  In interpreting easements, the rules of contract construction apply, and "the cardinal rule of construction is to ascertain the parties'

intent." See Crystal Farms, Inc. v. Road Atlanta, LLC, 302 Ga. App. 494, 496 (2010). There must be some limit to what the Defendants can discharge.  It is unreasonable to think that the New Manchester LLC meant for the Defendants to have the right to discharge runoff, even if the runoff was polluted and undermining the surrounding environment.  See Cook Indus., Inc. v. Carlson, 334 F. Supp. 809, 818 (N.D. Miss. 1971) (holding that a drainage easement "did not confer a right for either plaintiff to discharge polluted and contaminated water . . . [that] caused damage to defendants' property").

This is confirmed by looking at other provisions in the agreement.  The agreement provides that "[e]xcept for the Sweetwater Permitted Improvements, neither Sweetwater nor Douglasville Development shall erect any improvements or make any alternations to the Easement Parcel, and the Easement Parcel shall remain in a natural and undisturbed state." (Defs.' Mot. for Summ. J., Ex. 22, at 2) (emphasis added).  The Sweetwater Permitted Improvements are limited to activities that would maintain the natural state of the Easement Parcel: "(i) walking trails; (ii) stream reconstruction and/or remediation; (iii) wetland reconstruction and/or remediation; (iv) water quality system construction including control structures and filtration piping; and (v) such improvements as are approved by the Approving Engineers." (Id., Ex. 22, at 1-2.)  Even the Defendants seem to agree that maintaining the natural

state of the Stream and wetlands was a primary goal: "[T]he object of the drainage easement was not illegal or against a public policy; it simply allows the discharge and treatment of surface water runoff in a <u>natural way</u> as has occurred in this area for years."  (Defs.' Reply Br. in Supp. of Their Mot. for Summ. J., at 13) (emphasis added).

The Plaintiff has presented evidence that the Defendants' discharges have "impaired the water quality and biological integrity" of the Stream and the wetlands. (Compl. ¶ 14); (<u>see also</u> Whiteside Dep. at 86-87.)  Because New Manchester did not intend to give the Defendants an unlimited right to discharge runoff, the Defendants cannot rely solely on the easement to defeat the Plaintiff's claims.  The Defendants must also show that the discharges do not undermine the natural state of the environment and that is a disputed issue that should be resolved by a trier of fact. Therefore, the Defendants are not entitled to summary judgment based on the Drainage Easement and Restrictive Covenant.

F.    <u>Damages</u>

The Defendants say that the Plaintiff has not presented evidence of damages to support its state law claims for nuisance, trespass, and negligence.  But the Plaintiff has presented some evidence of damages.  It has presented evidence that its property has received sediment deposition of about 2,834.5 cubic yards, that this rate of

sedimentation may undermine the health of the wetlands, and that the cost of removing the sediment and restoring the wetlands is estimated at $980,000. (Expert Report of Richard W. Whiteside, at 5); (Whiteside Dep. at 86-87.) Moreover, even if the Plaintiff did not have evidence of actual damages, it could still recover nominal damages because its trespass claims involve a direct invasion of property. See Marshall v. Georgia Power Co., 134 Ga. App. 479, 480 (1975); Maddy v. Vulcan Materials Co., 737 F. Supp. 1528, 1539 (D. Kan. 1990) (describing the differences between direct and indirect invasions of property). Other than asserting that there was no evidence of damages, the Defendants have not provided much explanation for their argument. Therefore, the Defendants are not entitled to summary judgment based on lack of damages.

G.    Expert Testimony of John Vermont

In Richard Whiteside's expert report, there is a section titled "Sediment Removal." (Expert Report of Richard W. Whiteside, at 5.) In this section, he describes the details of sediment removal, how it would work for the Plaintiff's property, and that it would cost about $980,000. (Id.) To support his expert opinion, Whiteside included an exhibit to his report that provides further details about sediment removal. (Id., Ex. 2.) The exhibit is a memorandum from John Vermont, who is one

of Whiteside's employees.  The memorandum discusses some of the assumptions behind Whiteside's cost estimate.

The Defendants say that Vermont's expert testimony and report should be excluded because the Plaintiff did not comply with Rule 26 of the Federal Rules of Civil Procedure.  Rule 26 provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Fed. R. Civ. P. 26(a)(2)(A).  But the Plaintiff has not offered Vermont as an expert witness nor does it intend to do so at trial.  (Pl.'s Resp. to Defs.' Mot. to Exclude Expert Testimony and Report of John Vermont, at 1, 4.) Vermont's memorandum is also not an expert report.  It is a document that Whiteside relied on in forming his own expert opinion about the cost of sediment removal. Because Vermont is not an expert witness and his memorandum is not an expert report, there is no basis for the Defendants' motion to exclude.

The Defendants do make some arguments about why Whiteside should not be able to rely on Vermont's memorandum:

> Plaintiff tries to relax [the] rule[s] to allow an expert to adopt the second-hand opinions of a lay witness, which is far from the intention both of the Supreme Court and the federal rules.  Dr. Whiteside relied completely on the opinions in Vermont's memorandum . . . .  Not even an expert is able to base his opinion upon the opinions expressed by another witness.

(Defs.' Reply in Supp. of Their Mot. to Exclude Expert Testimony and Report of John Vermont, at 2-3.)  But it would be inappropriate to consider these arguments because the Defendants have not moved to exclude Whiteside's expert testimony.  Indeed, the Defendants emphatically say that they only ask the Court to exclude Vermont's testimony: "Defendants' Motion seeks exclusion of Vermont only.  If ultimately other admissible cost testimony is offered, so be it."  (Id., at 4.)  Because the Defendants have not moved to exclude Whiteside's expert testimony, his expert opinion about the cost of sediment removal is admissible.

## IV.  Conclusion

For the reasons set forth above, the Plaintiff's Motion for Partial Summary Judgment [Doc. 108] is DENIED, the Defendants' Motion for Summary Judgment [Doc. 126] is GRANTED IN PART and DENIED IN PART, and the Defendants' Motion to Exclude Expert Testimony and Report of John Vermont [Doc. 136] is DENIED.

SO ORDERED, this 16 day of August, 2010.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge